And the court will proceed to the third case, NewSpin Sports v. Arrow Electronics. Mr. R. Dower. Good morning, Your Honors. Peter R. Dower for the Plaintiff Appellant, NewSpin Sports. Your Honor, there's one overriding reason why this court should reverse the district court's decision, and that is the failure to allow us even a single opportunity to amend the complaint. That goes not simply to a violation of Federal Rule of Civil Procedure 15a, which encourages a liberal amendment policy, but it goes to a more fundamental policy, which is that cases should be decided on their merits when possible, unless there's a good reason not to do that. And there was no good reason in this case. The United States Supreme Court said that Rule 15 means that courts should allow amendments unless there's a good reason for denial, such as futility, undue prejudice, or bad faith. None of those kinds of factors existed here. This court has said in cases such as Bausch v. Stryker that courts should generally allow at least one opportunity to amend a complaint. And in Runyon v. Girl Scouts of Greater Chicago, the court said there's a presumption of at least one opportunity to amend, that denial of granting leave to amend creates a high risk of abusive discretion, which is the standard here, and that amendments should be granted unless it is certain that amendment would be futile. And in this case, we have just the opposite. We know that allowing the amendment in this case, which we submitted along with the motion for reconsideration, would have allowed the case to continue. Mr. Ortower, did you, during the motion to dismiss briefing, ask for the opportunity to amend if the court granted it, or was the first time you raised it in the motion to reconsider with the attached amendment? I'm not sure, Your Honor. We certainly submitted it and asked for that opportunity in the motion for reconsideration. And, in fact, the Seventh Circuit in Gonzales-Koenigke v. West said that the liberal amendment policy of Rule 15 is not affected by the fact that amendment is first sought under Rule 59 or 60, which is the case, which, even assuming we didn't ask, would be the case here. And lastly, there was no undue delay, which occurred, or no undue prejudice, which would have resulted from granting this amendment. So, in summary, with respect to that first point, the district court erred by disregarding the liberal policy of Rule 15, disregarding a long line of cases, which was especially highlighted in the Runyon case, in the Seventh Circuit and in the United States Supreme Court, that at least one opportunity to amend should be granted. And also, if you look at the court's ruling on the motion for reconsideration, there is no indication at all that the court even read or considered the content of the amendment in deciding whether to unilaterally just deny it. And that was also another error, which the Seventh Circuit has said is something that should be considered. The second major grounds for reversal is that the court misinterpreted this contract as a contract for goods, predominantly for goods, as opposed to predominantly a contract for services. Mr. Ordower, is the general agreement the contract error or the purchase orders? I think they're two separate series of agreements. The contract which is the subject of this case is the service agreement which was attached, and that provides for basically the defendant to have overseen the manufacturing process, and also more importantly, I think, to have figured out how to make this product. This product didn't exist until it was made. And at the time of this contract, it didn't exist. What we had was blueprints, what we had were specifications, and it was Arrow's job to see if they could create this into a viable product. And then the contract is very specific that if the product is acceptable, then there may or may not be secondary contracts, which are the purchase orders. And in this case, in the amended complaint, we submitted a purchase order which has all of the elements of a goods contract, and that's how we know that that first contract is not a goods contract, it's a services contract. How did you pay for that first contract? I don't think there was a separate payment. Yeah, but wouldn't that distinguish it if there was actual pay for service as opposed to a product? I don't think so, Your Honor, because I think this was a situation where Arrow was hoping, obviously, that there would be orders which would follow, and its efforts in putting together this product and formulating it would pay off if we decided later on to order a bunch of these things. They would make a profit on the sale of those items. That seems to be true in any business, though. You're trying to generate a business, and ultimately you did. You had complaints about the product when they arrived, apparently, but at least that's what you paid for. That's correct. I mean, certainly the overall purpose of hiring Arrow was to put together something that we would be able to sell, but the issue here is what statute of limitations to apply, and in applying the UCC Article II limitation period, the court badly erred, we believe, because Article II only applies to existing goods, which are existing and identified, goods which are movable at the time of the contract, or future goods if there is a present sale of them in the contract, and none of those were present in the contract, which is the subject of our case. What are the services that are at issue in the agreement? The services were defined in Section 1.1 of the contract, and basically it said that Arrow was to procure the components and supplies, engage a subcontractor for the manufacturer and assembly of the products, and if ordered, deliver the products to a designated location. All of those obviously are pursuant to a second series of contracts, though. And another factor in this contract, which establishes that it was a discrete contract for services, is that it had an integration clause, which could only be modified by mutual agreement of the party's mutual signature. And the purchase order that we submitted to the court with the amended complaint was 19 months later, and it had all the actual elements of a contract for goods. It had specification of the goods, quantity ordered, prices, total prices, delivery points, all of those were in a separate contract, and those were absent from this contract, which is the distinction between first you do the services portion of it, and then if there is an order, then there's an order for goods, which they would comply with if they were ordered. I still go back to that. If there's no order, do you owe them any money? No. For the services? No. I think it's not unusual, I don't think, in many businesses to put together a proposal to do some initial work, to do some initial drafting of some initial plans, for example, to show that you're the right guy to make the product and that you have a viable plan for it. And you do some work on it in the hope that you'll get an order and you'll make some money on it. But there, I think, are numerous kinds of business relationships where you do some services and you don't do it with an expectation of being paid at that point necessarily, but you're betting on the come that it'll pay off. Yeah, but that's where it gets into the difference between a service and a sale of goods. I'm a little vague on the actual goods that are produced, and you complain about the quality of those. Well, I think the goods that are produced... Give me an example. Well, these were, this was basically, as I understand it, an electrical component, which would be attached to golf clubs and tennis rackets and things like that to measure and help people, sportsmen who were using those devices, to measure their swings and improve their range of motion and speed and that kind of stuff. So that's the kind of thing. And I think when we approached Arrow, obviously we hoped that there was a good product there and we had a design for a product, but we didn't know if it was going to be entirely viable yet. And that's why we went to this company that professed to be an expert in manufacturing these kinds of products and in overseeing their development to see, before we spend a lot of money on this, is it even a viable product? And they said it was. They presented a number of models, I guess, over a period of years, really. And we decided to order them. It was only after ordering them and selling them and having them returned by the public as failures that we determined that they had misrepresented their ability and that they had fundamentally failed to do their job. Well, you paid for the product and then won your money back, I guess. Something like that. Yes, and also it more fundamentally destroyed, I mean, this was a new business and this was their prime product. And in addition to simply providing us with bad goods, which failed and cost us money, it also basically destroyed the entire business, including, for example, the first mover opportunity. By putting a lot of money into these products and into advertising them and things, we basically shot the wad of our resources and lost that market. Well, that's why we have a statute of limitations issue, though, whether it's a sale of a product or service. Right, and we're not arguing that there's no statute of limitations. We're arguing that it's the standard statute of limitations for contracts and for torts, which exist outside of the UCC because it cannot be subject to the UCC when there are no goods which are provided for in the contract. And so, you know, New York and Illinois both certainly have their own limitations periods for breaches of written contracts and for torts like fraud. And we fell within those limitations periods, but unfortunately the court misunderstood, I believe, or misread our original complaint, which said that some of the goods were shipped in 2012. And it apparently presumed that that meant all of the goods were shipped in 2012. The amended complaint we submitted made clear in one sentence, I think, that a lot of this product and a lot of these services were not provided until 2013, which made the claims timely under any statute that would apply in this case, whether it was the UCC statute or the typical statutes for breach of contract and fraud, all of which are longer than the UCC statute. The last major point I want to simply address is that the tort claim, one of the grounds in which the court dismissed some of the tort claims was that the court found that they were simply duplicative of the contract claims. And the contract provides that the substance of it is to be decided under New York law. We cited many cases under New York law in which pre-contract misrepresentations are independently viable claims. They're independent of the breaches of contract, and that is the case here. We allege that the fraud and the negligent misrepresentations and the tort claims preceded the sales, preceded the entry into the contract, that they revolved around Aero's misrepresentation of its ability and its experience of making these kinds of things and its expertise, which we relied upon, and that misled us into doing business with them. And under New York law, such as Kulight Corp. v. American Cyanamid, which we cited, pre-contract misrepresentations about a vendor's ability to produce a product are separately actionable from the breach of contract claims, which makes sense because the contract obviously only relates to the actual provision of the services or, later on, to the provision of goods. Mr. Ordova. Yes. I understand your, I think I do, your position on services versus goods, but would you comment on the agreement, Section 4.1, which speaks to, in the agreement, to setting forth the quantities, description, prices, and request of delivery dates for the products to be supplied in the future? I think that proves that it is not a goods contract. I think that provision says that if there is an order, it has to be the subject of a separate purchase order, and it has to set forth those terms. And the absence of those terms means this is a discrete contract for services and that there might be separate claims later on. Why is that language if you were seeking a model that you might purchase in the future? Why would you have that language? You would just ask to provide, I guess, a functioning device if it was just a service and then have another agreement later on. Why was this agreement, that language included in this agreement? If it was just for the service of producing an initial model. When you look at the, I mean, the purpose of the contract is to manage a manufacturing process, and as I said, the work includes, if it is later embodied in a purchase order, it includes oversight of the manufacturing process and delivery of it. So to me it makes perfect sense that those kinds of issues are addressed up front and that everyone knows what their limitations of liability are, et cetera. But again, those things don't kick in unless there is an optional series of purchase orders down the line to which those provisions can actually relate. And until so, there is no goods to deal with. Thank you, Jordan. Mr. Swanson. Thank you, Your Honors. May it please the Court, my name is Paul Swanson, and I'm counsel for Apelli Arrow Electronics, Inc. In this case, Newspen has alleged a simple breach of contract. The parties 2011 agreement requires Arrow to deliver certain circuit board products that Newspen would order. Newspen now alleges that those products were defective, but the allegations come too late. Newspen attempts several end runs around the four-year statute of limitations that applies here, and I want to address three of those today. First, Newspen tries to recharacterize the parties agreement as a services contract with a six-year limitation, even though the only things that Newspen ordered or received or paid for were goods. It didn't receive any services. Second, Newspen tries to repackage its contract claims as fraud claims, but it offers no clear material misrepresentations to support those fraud claims. And then third, after judgment, Newspen filed a motion for reconsideration that just rehashed the same arguments that the district court had already considered and rejected. Mr. Swanson, let me start with your third point, please. The district court did not address plaintiff's motion to amend, and the law in this circuit is crystal clear that it's appropriate to bring a motion to amend, pursuant to Rule 15, at the time that you file a Rule 59e motion. That's right, Your Honor, and it would be appropriate to do so. But there's a threshold issue that Newspen wasn't able to get passed. It's clear in Runyon, which Newspen cited for the first time in its reply brief, and in Gonzales-Konecki, which came down six months after Runyon, that before a plaintiff is able to put an amendment before the court, if there has already been a judgment, the plaintiff needs to get that judgment reopened, either through Rule 59 or Rule 60. So here we had a Rule 59 motion, and that Rule 59 motion didn't do what needed to be done. It raises the same arguments that the district court had considered and rejected, and it didn't raise any newly discovered evidence. Counsel for Newspen mentions that there is a reference to one sale in 2013 that might have been timely had it been alleged at the initial outset of the case, but that's based on a purchase order that was within Newspen's possession the whole time, and as a result that's not newly discovered evidence and wouldn't be a proper grounds. So you're saying that the court would have first had to reconsider and granted the motion to reconsider and then address the motion to amend? That's exactly right, Your Honor, and that's what happened. What is it that requires the court to do that? That's the holding in Runyon and then also in Gonzales-Konecki. In Runyon, the district court had concluded that reconsideration was warranted under Rule 59, and then it went on to apply the liberal amendment standard in Rule 15. And then in Gonzales-Konecki, the court expressly said that once you have a judgment, you're not going to be able to amend until the requirements of Rule 59 have been met. Now, a court may be able to consider the amended complaint while it is reviewing the Rule 59, but in this case, the motion for reconsideration under Rule 59 just has four sentences tacked on at the end that say, hey, please let us amend, but there's no argument about it. Shouldn't the court have considered the amended complaint in assessing the Rule 59 under Gonzales-Konecki? The court would have, I'm sure, if there had been any argument about how that amendment would have fixed the problems that led to the original dismissal. But shouldn't the court have done so? Shouldn't the court have tried or looked at the amended complaint? I think as this court has said, judges are not like pigs hunting for truffles buried in the record, and here it was Newspun's obligation to say to the court in its motion for reconsideration,  and here's why you should grant reconsideration on that basis, and Newspun didn't. Instead, just a short paragraph at the end of its motion for reconsideration says, oh, by the way, we'd like to amend, but with no explanation why that fixed things. So I'd like to, unless Your Honor has other questions on amendment at this point, I'd like to talk a little bit about the contract claim. The party's agreement in this case governs a sale of goods from Arrow to Newspun, and Newspun has consistently alleged in its original complaint and in its amended complaint that this is about a delivery of goods that was allegedly defective. As a result, the contract is governed by New York's UCC and its four-year limitation, which is ours to claim. Arrow's brief identifies multiple contractual provisions that would make no sense if this was a services agreement, and those are laid out at pages 8 through 11 of our brief. I won't rehash them here unless Your Honors have questions about those, but if the court has any doubt about the district court's conclusion that this was a sale of goods contract, I want to focus on three things. First, Newspun has said that this cannot be a contract for the sale of goods because the contract doesn't identify the goods or specify the number or discuss the delivery protocols for the goods, but that argument disregards several key provisions of the agreement. First, in Section 1.1, the contract says that Arrow would perform no work and deliver no products until it received a purchase order. The purchase orders, they kick off the process of performance of the contract. Second, in Section 4.1, which I think Judge Flom had mentioned, purchase orders would identify the ordered goods, their quantity, their price, and their delivery details. And then lastly, in Section 8.6, and this is important, the contract treats purchase orders as part of the contract itself. In the middle of that paragraph, Section 8.6, the agreement states, and I'll quote, when interpreting this agreement, precedents will be given to the respective parts in the following order, end quote. Then it goes on to list three parts. The agreement itself exhibits to the agreement, and then third, quoting, those portions of the purchase orders that are not preprinted, end quote. So the purchase orders are expressly integrated into the contract itself. Do you agree that if Plaintiff had originally alleged that the breach of contract was based on the 2013 purchase order, that it would have been timely? Your Honor, if that 2013 delivery of allegedly defective products had been alleged at the outset in January 2017, that would have fallen within the 4-year statute of limitations. The trouble is here, that allegation wasn't raised until August of 2017, outside of the 4-year statute of limitations. It would have related back, though, wouldn't it have? I don't think it would have, Your Honor, because this is a separate transaction or occurrence. Each of the alleged breaches was regarding a particular delivery under a particular purchase order. It was not part of the contract under Section 8.6, that the separate purchase orders were part of the contract. That's right, Your Honor. And I acknowledge that may sound like there's tension there, but Rule 15 doesn't say that any claim under a particular contract is going to be able to relate back to the initial filing of breach of contract claim. Instead, it says we need to look at the transaction or occurrence that's at issue. And here, I think each alleged breach is a separate transaction or occurrence. Because it is a separate delivery under a separate purchase order for separate products. Were it otherwise, as soon as you filed one breach of contract action, you could relate back all sorts of things that get brought down the line. And I don't think that that's what Rule 15 contemplates. The second thing I want to say about the contract is that the only thing delivered here was finished goods. Whatever services Arrow performed in developing and manufacturing those products, Newspin did not benefit from them and it did not pay a dime for them until Arrow delivered the products. The services had no value to Newspin independent of the products that it ultimately purchased from Arrow. If the party's contract here was a services agreement, I think that we would be effectively writing off New York's UCC. Take an example. You imagine a coffee wholesaler. He's got to go overseas and source coffee beans. Then he's got to take those beans and ship them back to the United States. Roast the beans, maybe grind the beans. Performs a lot of services to get those beans here. And those services are not going to render his subsequent sale of those coffee beans to some purchaser as part of a services agreement. That's going to be a sale of goods. And I don't think that changes if the purchaser says to the coffee bean wholesaler, Hey, we've got certain specifications. We want particular beans from Columbia or we want them roasted in a certain way. Those specifications, those extra services, don't turn that sale of coffee beans into a services agreement. But that's exactly what Newspin's reading of the contract here is trying to do. Newspin even goes so far as to say that Arrow's ongoing warranty obligations under the agreement, that those are services that make this a services agreement. Every sale of goods contract includes some services and warranties. And so if we were to take that reading of the agreement that Newspin proposes, we would effectively be doing away with the distinction between sale of goods and services agreements. Well, the product is this electronic device. I don't understand it all. But whatever it is, it's what was paid for. And that's why I was asking earlier as far as when you send a check and somebody pays for something, it's for the product. That's right, Your Honor. And oftentimes, let's face it, when a lot of other things that go into the value of that product, that goes into the sale price. And so it appears what's going on here. And that's why I'm a little concerned about the motion to amend, but if it's contingent with a motion to reconsider and you have to go back to it in Rule 59 and 60, and you get into it after the fact, it becomes a lot weaker argument. But I'm just looking at this. There is a product, and it's one that I assume your company received complaints about. It said it's not working or something or other. And you're right, Your Honor. This is about the product that was delivered and that Newspen then later said, hey, these products are defective. Newspen didn't pay us for anything else except for products and didn't submit purchase orders for anything other than products. And that's why it seems hard to believe that this could be anything other than a sale of goods agreement. I do want to address the Rule 59 and amendment issue a little bit more for Your Honors. As I mentioned earlier, the Runyon case, Gonzalez-Konecki, both of them consistently said that the first step has to be a successful Rule 59 motion. Until you get past the judgment, you're not going to be able to amend. And this follows a 35-year line of Seventh Circuit cases, Twohy, Paganis, Vesely, that reached the same conclusion and in many cases summarily rejected amendments where there was no basis to reopen judgment. In Paganis, the Seventh Circuit went so far as to say, you know, if there is not a valid Rule 59 motion, the district court doesn't even have to look at the amended complaint. Why shouldn't the district court, before getting to Rule 59, when the district court first ruled on the 12B6 motion, why shouldn't the court then, under our precedent, have given an opportunity to amend? Because we have said numerous occasions that when a 12B6 is granted, the district court should give at least one opportunity to amend. And that's right, Your Honor. In the normal course, the Seventh Circuit says that amendments should be granted or permitted in that situation. Here, we're dealing with a contract, and the contract will not change based on the amendment, nor will the dates of delivery change based on the amendment. We have a very clear document that speaks for itself as a matter of law, and so no change to the pleadings is going to alter that. And I think the district court perceived that what was before it couldn't really change. What about the 2013 purchase order? If the court had allowed amendment at the time, you've indicated it would have been timely. It would have been timely if it had been alleged when the case was first filed. But if, as was the case here, it was alleged outside of the four-year statute of limitations, it wasn't timely. Moreover, and I think this is important, just because that one delivery might have been timely, that wouldn't turn the other breaches into timely breaches, right? These are separate instances. If you could allege one timely breach, and with that timely breach bring in a whole slew of otherwise untimely breaches. But that's a separate question, what the final complaint would have looked like versus whether or not they should have been given the opportunity to put that complaint before the court. Sure. And I think that there are a couple things here, then. The court was facing a brand-new allegation of fact that was within Newspin's possession. It's understanding the whole time. And this court has said that when you know a fact and you don't allege it and it's material to whether or not you're going to have a case, that's going to be a problem for you. That the court is going to be skeptical of adding that new fact that was within your possession the whole time. In my remaining time, I want to hit a couple of points that were raised in the reply brief that we haven't had a chance to respond to. Newspin cites for the first time a Sixth Circuit case, Wells v. 10X Manufacturing, 40-year-old precedent. That case is distinguishable from this one, because there the purchaser gave to the manufacturer the raw materials and the designs, and all it asked the manufacturer to do was provide assembly services. Here, Arrow sourced the materials. Arrow did the design work. Arrow put the products together and then it delivered them, and all that Newspin provided was payment for it. And lastly, I want to touch on waiver. Newspin says that the arguments regarding negligent misrepresentation and the special relationship were waived. That's inaccurate. That was raised in our motion to dismiss briefing, pages 14 through 15 of our reply brief. It was also raised by the court. I see my time has expired. If I may finish those waiver points, I'd be happy to, but otherwise I can sit down. Thank you, Mr. Swanson. Thank you. Mr. O'Dowd, your time has expired, but you may have two minutes. Just a couple of points, Your Honors. First of all, with respect to the separateness of the purchase order versus this services contract, if this was just a contract for goods, there would have been no need for this services contract at all. We could have bought something from a catalog and just said, place our orders, and that would be it. That's not the case because this product didn't even exist yet. It was their job to try and formulate it, and that's where they fell down because they formulated bad products, which ultimately certainly resulted in shipping us bad products. But it was the failure of the manufacturing process and the management of that process which is the heart of our claim. The other point I guess I should address is the Rule 59 comment. Rule 59 allows for modification of a judgment where it's necessary to correct manifest errors of law or fact, and I think we pointed it out in the motion for reconsideration that there is mistakes in terms of the nature of the contract as well as misreading that some shipments in 2012 considering that as the last shipment and when it wasn't. I think that's all I would have to say. Thank you, Mr. Sponsor. The case is taken under advisement.